99 N.Y.2d 1 (2002)
780 N.E.2d 490
750 N.Y.S.2d 805
In the Matter of NEW YORK CITY TRANSIT AUTHORITY, Respondent,
v.
TRANSPORT WORKERS UNION OF AMERICA, LOCAL 100, AFL-CIO, et al., Appellants.
In the Matter of NEW YORK CITY TRANSIT AUTHORITY et al., Respondents,
v.
TRANSPORT WORKERS UNION OF AMERICA, LOCAL 100, AFL-CIO, et al., Appellants.
Court of Appeals of the State of New York.
Argued September 4, 2002.
Decided October 10, 2002.
*3 Kennedy, Schwartz & Cure, P.C., New York City (Arthur Z. Schwartz and Elizabeth M. Pilecki of counsel), for appellants in the first and second above-entitled proceedings.
*4 Richard Schoolman, Brooklyn, and David Boyle for respondent in the first and second above-entitled proceedings.
Michael A. Cardozo, Corporation Counsel, New York City (Alan Beckoff and Stephen J. McGrath of counsel), for City of New York in the first and second above-entitled proceedings, amicus curiae.
Chief Judge KAYE and Judges SMITH, CIPARICK, WESLEY, ROSENBLATT and GRAFFEO concur.

*5 OPINION OF THE COURT
LEVINE, J.
We granted leave to appeal in these cases to consider whether the courts below properly vacated two arbitration awards as violative of public policy. Each award modified the penalty of dismissal imposed by respondent New York City Transit Authority (NYCTA) or its subsidiary, Manhattan and Bronx Surface Transit Operating Authority (MABSTOA) for employees' violations of safety rules and, instead, imposed less severe sanctions. We reverse in both cases and reinstate the arbitration awards.

The Rodriguez Case
In the first case under review, David Rodriguez was a subway train operator for 16 years. His prior disciplinary record consisted of two suspensions for safety rule violations. A November 20, 1998 accident led to his dismissal by NYCTA. He had failed to set the hand brake on a nonpassenger work train when shutting it down, resulting in a collision with another train and his train's derailment. No one was injured. Some two weeks before the accident, Rodriguez attended a refresher training course which taught the need to set the hand brake under the same circumstances. NYCTA dismissed Rodriguez without pay effective December 10, 1998. His representative, Transport Workers Union of America, grieved that disciplinary action pursuant to the terms of its collective bargaining agreement with NYCTA. After a hearing before a tripartite arbitration panel (as provided in that agreement), the arbitrators upheld NYCTA's finding of Rodriguez's misconduct. However, in a decision dated January 22, 1999, the panel, by a two-to-one vote (NYCTA's representative dissenting) determined that the penalty of dismissal was excessive, given his long tenure of service with only two prior *6 "operational violations." "[B]ased upon the record as a whole and the parties [sic] progressive disciplinary policies," the panel reduced the penalty to time served without pay and a demotion for up to six months.
NYCTA then brought this proceeding pursuant to CPLR article 75 to vacate the award, and the union cross-petitioned to confirm. Supreme Court ruled in the union's favor. The Appellate Division reversed (279 AD2d 474) and vacated the arbitrators' reduction of the penalty and reinstatement of Rodriguez. The Court relied on the statutory duty of NYCTA to operate the transit system for the safety of the public, as provided in Public Authorities Law § 1204 (15). It held that "[r]equiring the NYCTA to reinstate an employee who has been found to be a threat to public safety is contrary to public policy" (id. at 474).

The Bright Case
Leroy Bright was a MABSTOA bus driver for over 20 years. On June 11, 1999, his bus struck and injured a pedestrian. He was suspended without pay (effective that day) in contemplation of dismissal. Appellant Transport Workers Union invoked the grievance/arbitration procedure of the collective bargaining agreement on his behalf, and a hearing was held before a single arbitrator. Following the hearing, the arbitrator, on October 25, 1999, issued an award. The arbitrator rejected Bright's exculpatory version of the accident and sustained the charge that he caused a preventable accident. The arbitrator, however, declined to impose the "ultimate penalty" of dismissal, instead ordering reinstatement without back pay and declaring that the disposition was to "serve as a final warning" that a similar violation would put Bright at risk of termination. On the petition of NYCTA and MABSTOA, Supreme Court vacated the arbitrator's award insofar as it reduced the sanction from dismissal to a suspension without pay, on the ground that it was against the public policy embodied in Public Authorities Law § 1204 (15). The Appellate Division affirmed (280 AD2d 677).

I
Our courts have long since abandoned their distrust and hostility toward arbitration as an alternative means for the resolution of legal disputes, in favor of a policy supporting arbitration and discouraging judicial interference with either the process or its outcome (see Matter of Sprinzen [Nomberg], 46 NY2d 623, 629 [1979]). Under our modern arbitration jurisprudence, judicial intervention on public policy grounds constitutes *7 a narrow exception to the otherwise broad power of parties to agree to arbitrate all of the disputes arising out of their juridical relationships, and the correlative, expansive power of arbitrators to fashion fair determinations of the parties' rights and remedies.
We articulated the limited role of the public policy exception as applying only in
"cases in which public policy considerations, embodied in statute or decisional law, prohibit, in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator. Stated another way, the courts must be able to examine an arbitration agreement or an award on its face without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its enforcement." (Matter of Sprinzen, 46 NY2d at 631 [emphasis supplied].)
Judicial restraint under the public policy exception is particularly appropriate in arbitrations pursuant to public employment collective bargaining agreements. In those instances, the Legislature in the Taylor Law explicitly adopted a countervailing policy "encouraging such public employers and such employee organizations to agree upon procedures for resolving disputes" (Civil Service Law § 200 [c]), as a means of promoting harmonious relations between governmental employers and their employees, and preventing labor strife endangering uninterrupted governmental operations (see Matter of Board of Educ. of Yonkers City School Dist. v Yonkers Fedn. of Teachers, 40 NY2d 268, 273 [1976]; Board of Educ. v Associated Teachers of Huntington, 30 NY2d 122, 131 [1972]).
The Taylor Law was passed to provide the means for achieving labor peace in the public sector, and for resolving the disputes which resulted in severe work stoppages under prior law. In his memorandum of approval of the Taylor Law, Governor Rockefeller stated:
"The necessity of this law has been unquestionably demonstrated over the years by the utter inadequacy of the Condon-Wadlin Law to resolve paralyzing strikes and threats of strikes by public employees" (1967 Legis Ann at 273).
The critical role of collective bargaining agreements' grievance/arbitration machinery in stabilizing labor relations has been *8 well recognized. More than 40 years ago, Justice Douglas wrote that "arbitration [of labor disputes] is the substitute for industrial strife [and] * * * has quite different functions from arbitration under an ordinary commercial agreement * * *. For arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself" (United Steelworkers v Warrior & Gulf Nav. Co., 363 US 574, 578 [1960]).
Additionally, in labor disputes, arbitrators are mutually chosen by labor and management because of their particular expertise and insight into the relationship, needs of the parties, conditions existing in the specific bargaining unit, and the parties' "trust in [the arbitrator's] personal judgment to bring to bear considerations which are not expressed in the contract * * *. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because [the judge] cannot be similarly informed" (id. at 582).

II
The public policy consideration invoked by the Authorities in the instant cases to vacate the arbitration awards manifestly fails to meet the strict standards for overturning such awards on public policy grounds that have been developed in the case law. The narrowness of the public policy exception, as applied to the arbitration process under collective bargaining agreements, is designed to ensure that courts will not intervene in this stage of the collective bargaining process in pursuit of their own policy views, or because they simply disagree with the arbitrator's weighing of the policy considerations.
In both cases, the Authorities entered into collective bargaining agreements that required the arbitration of disputes regarding employee discipline. However, they argued below, and the Appellate Division agreed, that the awards should be vacated as violative of the general statutory powers granted to NYCTA and MABSTOA under the Public Authorities Law: "[t]o exercise all requisite and necessary authority to manage, control and direct the maintenance and operation of transit facilities * * * for the convenience and safety of the public" (Public Authorities Law § 1204 [15]).
This provision can only form the basis for vacating the awards if we are able to conclude, "without engaging in any extended factfinding or legal analysis" that it "prohibit[s], in *9 an absolute sense, [the] particular matters [to be] decided or certain relief being granted" (Matter of Sprinzen, 46 NY2d at 631; Matter of Town of Haverstraw [Rockland County Patrolmen's Benevolent Assn.], 65 NY2d 677, 678 [1985]).
NYCTA cannot contend that section 1204 (15) "prohibit[s], in an absolute sense, [the] particular matters [to be] decided * * * by [arbitration]" (emphasis supplied), the first prong of the public policy exception. That is, the section does not prevent NYCTA from agreeing that the disciplining of employees for safety violations is to be submitted to and decided by an arbitrator. First, the collective bargaining agreements in these cases could not be more explicit in specifying that "no warning, reprimand, suspension or dismissal shall be * * * imposed until the completion of the disciplinary procedure" before either a single arbitrator or a tripartite arbitration panel. Moreover, although NYCTA and MABSTOA opted for outright dismissal, the penalty issues "[f]rom the onset" were "litigated, and the rights of the parties determined, under the auspices of the collective bargaining agreement[s]" (Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York, 94 NY2d 321, 327-328 [1999]).
The legislative authority to "manage, control and direct" the operation of New York City's public transportation system for the "convenience and safety of the public" does not translate into a statutory prohibition against some relinquishment to arbitrators of the final say in safety matters when they arise in the context of employee discipline. In Matter of Port Jefferson Sta. Teachers Assn. v Brookhaven-Comsewogue Union Free School Dist. (45 NY2d 898, 899-900 [1978]), we said:
"Every collective bargaining agreement involves some relinquishment of educational control by a school district * * *
"Of course, there are some duties or responsibilities so important that a school district will not be permitted to delegate them or to bargain them away. As to these matters, arbitrators may not alter the responsibilities vested by law in the board of education * * * [citations omitted]. Arbitration is forbidden not because matters of public interest are involved, but because statutes require that the decisions be made by educational authorities."
Here, the relevant statute does not expressly reserve to NYCTA and MABSTOA management the nondelegable responsibility *10 to decide the appropriate penalty for an employee's breach of safety rules. Thus, respondent Authorities were not prohibited under Public Authorities Law § 1204 (15), or any other law they have cited, from ceding to arbitrators the ultimate responsibility to decide an appropriate penalty after weighing such factors as the seriousness of the offense and of the resulting accident, the employee's service record and seniority, any past practices under the same facts, and the effect of the sanction on overall morale and discipline. In these cases, after that kind of deliberative process, the arbitrators determined that serious sanctions short of dismissal were appropriate.
Nothing in Public Authorities Law § 1204 (15) authorized NYCTA or MABSTOA then to supersede the arbitrators' determinations. In this respect, these cases are controlled by Matter of New York State Correctional Officers & Police Benevolent Assn. (94 NY2d 321). In that case, an arbitrator found a prison guard not guilty of charges that he violated sections of the Department of Correctional Services employee manual by his off-duty, off-premises display of a Nazi flag on the anniversary of Hitler's 1941 declaration of war against the United States. In part, the arbitrator based that finding on an assessment that no actual harm to the safety, security and order of the prison resulted from the guard's conduct. In New York State Correctional Officers, we held that the arbitrator's award factually exonerating the guard from the charges properly and voluntarily submitted to arbitration could not be found to violate any defined public policy of the State.
In New York State Correctional Officers, we also rejected, however, an alternative argument for vacatur of the award analogous to the position of the Authorities here. The State invoked Correction Law § 137 (2), which confers upon the Commissioner the responsibility to "provide for such measures as he may deem necessary or appropriate for the safety, security and control of correctional facilities and the maintenance of order therein." As is readily apparent, the duty to satisfy safety concerns in that grant of authority is at least as urgently expressed as the grant to NYCTA under Public Authorities Law § 1204 (15) of "all * * * necessary authority [to operate the New York City transit system] for the convenience and safety of the public."
In Matter of New York State Correctional Officers & Police Benevolent Assn., the State contended that Correction Law § 137 (2) embodied a public policy preventing an arbitrator *11 from substituting his or her judgment for that of the Commissioner on the risk to prison order and security represented by the guard's conduct. This Court rejected that public policy argument:
"By submitting the issue of Kuhnel's conduct to arbitration, the parties placed upon the arbitrator the responsibility of passing on the implications of Kuhnel's offensive conduct under the collective bargaining agreement. We must honor the choice of the parties to have their controversy decided in that forum" (94 NY2d at 329).[*]
Finally, these cases do not qualify for judicial intervention under the second prong of the public policy exception, that the award itself "violate[s] a well-defined constitutional, statutory or common law of this State" (id. at 328). Any analysis of whether an arbitration award violates public policy must, of course, begin with the actual terms of the award. Here, although the awards directed reinstatement of the employees, they clearly did not disregard safety concerns and the seriousness of the breaches of safety rules. Instead, they imposed serious financial sanctions in both cases. With respect to Rodriguez, a forfeiture of approximately six weeks' pay and a six-month demotion were imposed. Under Bright's award, he lost over four months' pay and was issued a warning that another offense would place him at risk of terminationin effect, putting him on probation.
Our task then is to determine whether an identifiable public policy exists, "embodied in statute or decisional law, [which] *12 prohibit[s], in an absolute sense" the arbitrators from substituting severe sanctions for outright dismissal in these cases (see Matter of Sprinzen, 46 NY2d at 631). Again, NYCTA and MABSTOA point to Public Authorities Law § 1204 (15) as the statutory fulcrum for invalidating the awards. Undeniably, however, the imposition of the duty to "manage" public transportation in the City of New York "for the convenience and safety of the public" does not in any direct, let alone absolute, sense set forth requirements or standards for the disciplining of employees violating safety rules.
Since section 1204 (15) contains no reference whatsoever to sanctions for transit workers' unsafe conduct, we could readily conclude that its allusion to public safety simply is too generalized and ill-defined to support any intervention in the results of the disciplinary grievance/arbitration process under the collective bargaining agreements (see Matter of New York State Correctional Officers & Police Benevolent Assn., 94 NY2d at 327). We need not reach that conclusion in order to decide these appeals, however. Section 1204 (15) can, persuasively, also be read to mandate the enforcement of some kind of disciplinary regime when transit operational employees violate safety rules and thereby cause dangerous accidents. However, because that public policy mandate would not explicitly or, indeed, even impliedly demand the imposition of the ultimate and final sanction of dismissal rather than substantial forfeiture of pay and probation (as reflected in the awards in these cases), section 1204 (15) does not justify overturning the arbitrators' penalty determinations in these cases (see Matter of Port Jefferson Sta. Teachers Assn., 45 NY2d at 899).
As the United States Supreme Court has framed the rationale for upholding the arbitration award when safety was the policy concern in an analogous case, because Public Authorities Law § 1204 (15) would not prohibit the parties to these collective bargaining agreements from having incorporated disciplinary standards providing for severe financial sanctions short of dismissal under the factual circumstances of these cases, the public policy embodied in that section is insufficient to justify overturning arbitration awards achieving the same results (see Eastern Associated Coal Corp. v United Mine Workers of Am., 531 US 57, 61-65 [2000]).
NYCTA's and MABSTOA's remaining arguments for affirming the Appellate Division are also unpersuasive.
Accordingly, in case number 106, the order of the Appellate Division should be reversed, with costs, and the judgment of *13 Supreme Court, Kings County, reinstated. In case number 107, the order of the Appellate Division should be reversed, with costs, and the petition to vacate the arbitration award dismissed.
In Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO: Order reversed, etc.
In Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO: Order reversed, etc.
NOTES
[*] NYCTA and MABSTOA argue alternatively that the arbitrators, in rejecting the dismissals of Rodriguez and Bright, exceeded a restriction on their power in the collective bargaining agreement, i.e., from "render[ing] any opinion * * * limiting or interfering in any way with the statutory powers, duties and responsibilities of the Authority in operating * * * the transit facilities, or with the Authority's managerial responsibility to run the transit lines safely." In essence, the Authorities are thus claiming that any penalty less severe than dismissal in these cases would interfere with their exclusive contractual rights to make safety-related judgments. This position is undercut, however, by the fact that the Authorities submitted these disputes to arbitration without having first questioned the arbitrators' power to override their judgment that safety considerations mandated the dismissals. If the Authorities envisioned this challenge to the arbitrators' power, they should have moved to stay arbitration. Again, we must honor their decision that the arbitrators, acting within their power under the agreements, could pass on the appropriateness of the penalty of dismissal (see Matter of New York State Correctional Officers & Police Benevolent Assn., 94 NY2d 321 [1999]).