OPINION OF THE COURT
Mazzarelli, J.P.
Respondents Christopher Dal Piaz and Elizabeth Schoelkopf (the Owners), engaged petitioner Mclver-Morgan, Inc. (Mclver) to design a major renovation of their townhouse. Promotional materials created by Mclver reflect that it holds itself out as “a full service firm specializing in all facets of high-end residential interior design and architectural services.” It is undisputed that Mclver is a business, not professional, corporation, and that the entity does not have a license to practice architecture. Mclver does, however, employ George Queral, who is a licensed, but not registered, architect. It also periodically uses an outside consultant, Robert Schwartz, a licensed and registered architect. Because Schwartz has many close contacts in the New York City Buildings Department and other related agencies, Mclver recommended to the Owners that they use him on their project *49 as an expediter who could sign and seal architectural drawings and then file them with the Buildings Department.
The written agreement between the Owners and Mclver set forth the basic services, broken down into four phases, which the latter would provide. These included a “schematic design” phase in which Mclver would prepare schematic design documents that illustrate the scale and relationship of the project components, including a conceptual site plan and preliminary building plans. The second phase was “design development” in which Mclver would produce “plans,” “drawings,” and “outline specifications and other documents,” as would evidence “the scope, relationships, forms, size, and appearance of the Project.” The third stage was the “construction documents” phase in which Mclver would provide, inter alia, “Drawings and Specifications that establish in detail the quality levels of materials and systems required for the Project.” The final phase was for “contract administration services,” in which Mclver would essentially act as the Owners’ representative during construction. The agreement expressly provided that “Consultants including but not limited to a Structural Engineer, a Mechanical Engineer, and a Surveyor may be required during Phase one, two, three and four. Services of Consultants will be coordinated by [Mclver], paid for by the Owner[s] and included in the cost of Construction.” The parties agreed that the Owners would pay Mclver 15% of the overall “Construction Cost” for the project, which would be due in estimated 25% increments upon the completion of each of the four phases of the project. They further agreed to submit any disputes arising out of the agreement to an arbitrator.
At some point during the renovation, the Owners terminated the agreement based on Mclver’s alleged failure to perform in a timely fashion. Mclver filed for arbitration. The Owners counterclaimed for, inter alia, restitution by Mclver of $37,500 which the Owners claimed they paid to Mclver for architectural services. They argued that public policy precluded Mclver from charging for such services because it did not possess an architectural license. Before conducting a hearing, the arbitrator issued, at the parties’ request, a preliminary order on the issue of arbitrability. The order stated, among other things, that the agreement for designer services was not invalid on public policy grounds, although Mclver is not a licensed, registered architect. The arbitrator observed that the agreement’s terms explicitly gave notice that outside “consultants, including ... a *50 structural engineer, mechanical engineer, and a surveyor may be required,” and that their “assistance” could be used on the project. The arbitrator also determined that Mclver’s
“subsequent proposal that Mr. Schwartz, an RA [Registered Architect], be retained as a consultant to ‘prepare and file’ drawings with the Department of Buildings and the Landmarks Preservation Commission, assures that such services will be performed by an appropriately licensed professional, and is not inconsistent with the agreement’s provision that other ‘consultants . . . may be required’ nor contrary to the provisions of NY State Education Department regulations.”
At the hearing that followed, Queral testified that he prepared architectural drawings for the project in question, but that Schwartz always reviewed them. He stated that “I e-mailed [Schwartz] the plans and then we talked on the phone and he would say, we have to change this or that, and so I would do it.” It is apparent from Queral’s testimony that Schwartz’s recommended changes were substantive in nature. Schwartz also appeared at the arbitration hearing. He testified that he did not sign and seal the architectural drawings made by Queral until they were revised “to my satisfaction.” Schwartz further stated, with respect to Queral, “When he’s working with the drawings with me, he’s working under my supervision, so I’m reviewing the plans and he’s working under my supervision.” Finally, although his testimony was somewhat equivocal on this point, Schwartz testified that he was “the architect” for the project.
The arbitrator found in favor of Mclver on its claim for unpaid fees in the amount of $127,622.13, together with interest from the date the arbitration was filed. To the extent the Owners contended that Mclver was not entitled to any compensation for any architectural services it rendered, the arbitrator referenced his preliminary order, wherein he denied the Owners’ argument to strike the agreement on the basis that Mclver provided architectural services without a license. The arbitrator further found that while the Owners had terminated the agreement for alleged untimely performance by Mclver, the terms of the agreement did not specify a time-line for Mclver’s performance, but rather contained language allowing for time adjustments during the course of the project. The arbitrator noted that the evidence and testimony at the arbitration hearings indicated that “numerous” design changes requested by the Owners, includ *51 ing an increase in the scope of the project, had led to delays for redesign and a “higher than expected” cost for the project. Finally, the arbitrator found that the Owners terminated Mclver at or about the completion of phase three of the project, and so it was only entitled to receive 75% of what it contended it was owed for that phase, since the drawings submitted to the Owners were incomplete and uncoordinated, and were lacking mechanical and structural engineering drawings.
Mclver commenced this special proceeding to confirm the arbitrator’s award. The Owners denied the material allegations in the petition, and asserted as grounds for denying confirmation of the award, and dismissal of the petition (which they sought by cross motion), that the agreement was “void as against public policy” based on Mclver’s lack of an architect’s license; that Mclver’s conduct violated statutory law prohibiting and criminalizing such conduct (citing Education Law §§ 6512, 7300, 8300); and that the award was irrational. Supreme Court granted Mclver’s petition, adopting the reasoning in the petition.
Because of the great degree of deference afforded to arbitration awards, the available grounds for vacating them are extremely limited. Mere errors of law or fact reflected in an arbitration award are insufficient for a court to overturn it, since “the courts should not assume the role of overseers to mold the award to conform to their sense of justice” (Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d 471, 480 [2006], cert dismissed 548 US 940 [2006]). A court may only disturb the award “when it violates a strong public policy, is irrational or clearly exceeds a specifically enumerated limitation on an arbitrator’s power” (Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York, 94 NY2d 321, 326 [1999]).
With regard to the public policy ground, the focus is on whether
“public policy considerations, embodied in statute or decisional law, prohibit, in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator. Stated another way, the courts must be able to examine an arbitration agreement or an award on its face, without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its enforcement” (Matter of Sprinzen [Nomberg], 46 NY2d 623, 631 [1979]).
*52 In Sprinzen, the Court, pursuant to these principles, refused to vacate an arbitrator’s award enforcing a restrictive covenant barring future employment, even though there was “some doubt” whether the Court would have enforced it (id. at 632). That was because “[w]hile it is true that considerations of public policy militate against the enforcement of restrictive covenants of future employment, these covenants are not per se unenforceable as being null and void. Each case turns upon its own distinct facts” (id. at 631-632 [citations omitted]).
Here, the face of the award rejected the Owners’ bid to recover the amounts they paid Mclver for architectural services on the basis that Mclver was not licensed. Just like in disputes involving restrictive employment agreements, whether an unlicensed entity offering services regulated by the Education Law may enforce its contract must be decided on a case by case basis. That is because the provisions in the Education Law requiring a license to practice architecture are not to be “slavishly applied” (Charlebois v Weller Assoc., 72 NY2d 587, 595 [1988]).
In Charlebois, an agreement between a general contractor and a building owner called for a licensed architect-engineer to provide engineering services. The owners later claimed that this arrangement violated the public policy codified in the Education Law because the general contractor itself was required to hold an engineering license. The Court of Appeals rejected this position, holding that “the design functions were contracted for and actually performed by a named licensed engineer, as the [owners] agreed and expected under their contract” (72 NY2d at 594) and that
“[n] either a fair reading of the contractual arrangement nor the regulatory scheme designed to protect an important public policy would support a view that [the general contractor] agreed for itself to engage or actually engaged in the practice of engineering. That is what the Education Law forbids under these circumstances. The design in this case as part of the over-all project was performed lawfully by a licensed professional” (id. at 594-595).
Perhaps most importantly, the Court stated:
“Finally, forfeitures by operation of law are strongly disfavored as a matter of public policy and the [own *53 ers’] efforts to use that concept as a sword for personal gain rather than a shield for the public good should not be countenanced in the name of the Education Law public policy, slavishly applied. The legislative objective, after all, is professional performance — a matter of substance — not the vehicle of professional performance — a matter of form” (id. at 595).
Several decisions from this Court echo the Court of Appeals’ admonition that, above all, a commonsense approach to the operative facts should dictate whether the mere fact that a contractor leading a construction project does not have a professional license should preclude it from recovering its fee. For example, in SKR Design Group v Yonehama, Inc. (230 AD2d 533, 534 [1st Dept 1997]), the plaintiff held itself out as “Interior Designers Planners Architects” which would provide “architectural and interior design services.” It entered into a contract with the defendant to provide “construction and design services” for a restaurant that the defendant was building (id.). The plaintiff was not a licensed professional corporation. However, the evidence showed that the contract provided that “[d]esign services shall be performed by qualified architects, engineers and other professionals selected and paid by the Design/Builder” (id. at 536 [internal quotation marks omitted]). Further, all of the architectural work, including the signing and sealing of the plans, was performed by a licensed and registered architect. This Court held that the arrangement met the standard set forth in Charlebois and stated: “That a contractor engages the services of a licensed professional to perform a portion of the services covered by the contract does not convert that contract into one for the performance of those services” (230 AD2d at 537). We further stated:
“Since the purpose of the licensing requirements is to ensure that the regulated work is performed by those with the necessary skills and training, we see no reason why the contract must designate a specific person. Where a licensed architect performed all of the services despite not being named in the contract, as here, the effectiveness of the regulatory scheme is not weakened. This is true because the licensed professional selected remains ‘inescapably subject to the educational, regulatory and punishment mechanisms of the licensing entity’ ” (id. at 537, quoting Charlebois, 72 NY2d at 592).
*54 We held similarly in Cherokee Owners Corp. v DNA Contr., LLC (96 AD3d 480 [1st Dept 2012]).
On the other hand, in Alex Greenberg, DDS, PC v SNA Consultants, Inc. (55 AD3d 418 [1st Dept 2008], lv denied 12 NY3d 707 [2009]), this Court held that the evidence established that the defendant contractor’s work was more in the nature of architecture, for which it held no professional license, and not interior design, as it claimed, and found that the agreement was unenforceable. Moreover, in P.C. Chipouras & Assoc. v 212 Realty Corp. (156 AD2d 549, 549 [2d Dept 1989]), the Second Department found that the Education Law was violated because “[t]he level of review or participation in the construction drawings by a licensed architect allegedly working on the project was not sufficient to render the work product his own.”
That the outcomes of these cases vary is a testament to their fact-intensive nature. This case falls somewhere between those cases where an unlicensed entity unquestionably did all of the architectural work itself, and those where all of the architectural work was legitimately performed by a licensed architect. However, that is the very reason why we may not interfere with the arbitration award, since we may not “engag[e] in extended factfinding or legal analysis” before declaring that an arbitration award violates public policy (Matter of Sprinzen, 46 NY2d at 631; Transparent Value, L.L.C. v Johnson, 93 AD3d 599, 600 [1st Dept 2012]). Given that Schwartz’s involvement, at the very least, raises a serious question as to whether Mclver satisfied the spirit of the Education Law, we would have to engage in such a review of the factual record to reach that conclusion.
Even if we could examine the facts in this record, we would be constrained to conclude that the arrangement here did not violate public policy. Again, courts are to consider all of the circumstances in determining whether the goals of the Education Law’s licensing requirements are met, and are not to elevate form over substance (see Charlebois at 595). In supervising Queral’s preparation of the architectural plans and insisting that his changes be adopted, in addition to his signing and sealing of the architectural drawings, it is clear to us that Schwartz had a substantive, active role in the provision of architectural services.
Further, the parties’ agreement sufficiently notified the Owners that Mclver might retain outside contractors to provide professional services. There is no basis for the Owners to argue *55 that the nonexhaustive list of professionals named in that provision excluded architects such as Schwartz. Indeed, the situation was substantially similar to that in SKR Design Group, where we held that a contractor had no obligation to specify who would be providing the architectural services (230 AD2d at 537).
Finally, nothing in the record supports the Owners’ argument that the arbitrator’s conclusion that Mclver did not breach the agreement by failing to perform in a timely fashion was irrational. The arbitrator correctly found that there is no language in the agreement that required Mclver to perform by a date certain. There was correspondence between the parties setting target dates for completion of certain phases of the project, but the dates were not inflexible. Moreover, the arbitrator found that the Owners contributed to the delays by changing the scope of the project, and some of the designs, in midstream.
Accordingly, the order of the Supreme Court, New York County (Milton A. Tingling, J.), entered March 26, 2012, which granted the petition to confirm an arbitration award, should be affirmed, without costs.
Moskowitz, DeGrasse, Manzanet-Daniels and Clark, JJ. concur.
Order, Supreme Court, New York County, entered March 26, 2012, affirmed, without costs.