## Matter of Middleton v New York City Tr. Auth.

2024 NY Slip Op 33533(U)

October 1, 2024

Supreme Court, New York County

Docket Number: Index No. 656352/2023

Judge: Shahabuddeen Abid Ally

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

This is an Amended Decision and Order, which corrects a typo on page 23, recalls and replaces the Decision and Order dated 9/30/24 and entered in NYSCEF on the same date as Doc. 31.

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:     **HON. SHAHABUDDEEN ABID ALLY**                     PART 16TR
*Justice*

| | |
|---|---|
| In the Matter of the Application of | |

CASHAY S. MIDDLETON and TRANSPORT WORKERS UNION OF AMERICA LOCAL 100,

Petitioners,

For an Order Confirming an Arbitration Award Under Article 75 of the CPLR,

-against-

NEW YORK CITY TRANSIT AUTHORITY,

Respondent.

**INDEX NO.**          656352/2023

**MOTION DATE**       4/26/2024

**MOTION SEQ. NO.**       001

**AMENDED
DECISION & ORDER**

The following e-filed documents, listed by NYSCEF document number, were read on this motion (Seq. No. 1) to/for **ARTICLE 75 (CONFIRM AWARD)**:  1-12, 14-27, 29-30

Petitioner brings this special proceeding pursuant to CPLR Article 75 for an order confirming an arbitration Opinion and Award, dated November 20, 2023, directing respondent NEW YORK CITY TRANSIT AUTHORITY ("NYCTA") to reinstate petitioner CASHAY S. MIDDLETON ("Middleton") to her position as a bus operator for NYCTA. Middleton commenced the proceeding by Verified Petition and Order to Show Cause filed on December 15, 2023. The Court signed the Order to Show Cause on January 9, 2024, and it was entered on January 18, 2024. NYCTA thereafter filed a Verified Cross-Petition and Notice Cross-Petition on February 6, 2024, seeking an order, pursuant to Article 75, vacating the arbitration award. Upon the parties' filings, for the reasons discussed below, Middleton's Verified Petition is **DENIED**, and NYCTA's Verified Cross-Petition is **GRANTED**.

[* 1]

## I.   BACKGROUND

### A.   Middleton's Discipline[1]

NYCTA appointed Middleton to the position of bus operator on March 18, 2019 (Opinion and Award, dated November 20, 2023 ("O&A") (NYSCEF Doc. 5), at 7). As a nonmanagerial operational employee of NYCTA, Middleton was represented for collective-bargaining purposes by petitioner TRANSPORT WORKERS UNION OF AMERICA LOCAL 100 ("Local 100"; and, together with Middleton, "Petitioners"). (Resp't's Verified Cross-Petition ("Cr.-Pet.") (NYSCEF Doc. 16) ¶¶ 30-31; Pet'rs' Verified Answer ("VA") (NYSCEF Doc. 26) ¶¶ 30-31) NYCTA and Local 100 are parties to a collective-bargaining agreement (the "CBA") governing the terms and conditions of employment of employees represented by Local 100. (Cr.-Pet. ¶ 34; VA ¶ 34; CBA (NYSCEF Doc. 4)) The CBA provides for the resolution of grievances involving interpretation and application of the CBA and of disciplinary charges and appeals that NYCTA brings against any employee by binding arbitration.

Pursuant to the Code of Federal Regulations ("CFR") title 49, parts 40 and 655, NYCTA, as a public-benefit corporation that receives funding from the federal government, is required to implement and carry out a policy of drug testing its employees, including random drug tests. NYCTA implemented such a policy, and Local 100 agreed to it in the CBA. Specifically, as relevant here, under the CBA an employee classified as "safety-sensitive" must submit to a random drug test when ordered by NYCTA to do so. (CBA, app. E-1 (NYSCEF Doc. 23), § 5.3) Prior to the random drug test that forms the basis for this proceeding, NYCTA randomly drug tested Middleton a total of 10 times. (O&A at 7) She never tested positive. (*Id.*)

On March 8, 2023, Middleton appeared, at NYCTA's direction, for another random drug test. (*Id.*) On the intake questionnaire, Middleton indicated that, 14 or 15 years earlier, she had problems urinating and with pelvic floor and menstruation and had been hospitalized. (*Id.*) During the three-hour time limit of the test, during which she was provided two bottles of water, Middleton was able to produce only 30 milliliters of the 45 milliliters of urine required for a sample under the applicable regulations. (*Id.* at 7-8)

---

[1] Unless otherwise indicated, the following facts are drawn from the arbitrator's Opinion and Award and are undisputed.

**656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority**
**Mot. Seq. No. 001**

**Page 2 of 28**

Based on Middleton's failure to provide the required amount of urine, the NYCTA Medical Review Officer ("MRO") designated pursuant to the applicable regulations, Dr. Louise Donikyan, checked the "No Work Temporary" box on the required paperwork and directed Middleton to return to see the MRO on March 16, 2023. (*Id.* at 7) Dr. Donikyan also prepared a letter for Middleton's physician that generally explained the test failure and federal requirements, including the explanation that, "[i]f there is no longstanding medical condition that could have precluded [Middleton] from providing the 45 cc of urine in a single aliquot within the 3 hour time limit, she will be deemed a Refusal to Test which is similar to having a positive drug test and will be up for disciplinary action, and possible termination." (*Id.* at 8) The letter also asked Middleton's physician to "[p]lease provide your opinion as well as any objective testing reports to support." (*Id.*)

Middleton visited her personal physician, Dr. Emine Cosar, on March 17, 2023. (*Id.* at 9) Dr. Cosar, who is not a urologist, provided Middleton with a note stating that no medical condition prevented her from producing the requisite amount of urine. (*Id.*)

On March 22, 2023, Middleton visited Dr. Donikyan again. (*Id.*) During the visit, Middleton provided Dr. Donikyan with Dr. Cosar's note as well as a history of Middleton's alleged pediatric kidney and urinary tract conditions. (*Id.*) Dr. Donikyan deemed Middleton's failure to produce a sufficient urine sample on March 8 a test refusal. (*Id.*)

During Middleton's March 22 visit, Dr. Donikyan referred Middleton to Dr. Donikyan's own urologist, Dr. Igor Ryndin. (*Id.*) On March 30, 2023, Dr. Donikyan received a letter from Dr. Ryndin stating that he had seen Middleton and found a 5-millimeter kidney stone in her right kidney via a sonogram. (*Id.* at 10) The letter also noted the presence of several kidney stones of various sizes in Middleton's right kidney; a history of mild to moderate obstructive urinary symptoms and the pharmacological treatment of those symptoms; incomplete bladder emptying; urinary-tract infection; blood in her urine; and suspicion of passing a ureteral stone. According to Dr. Ryndin's letter, Middleton had "a planned cystoscopy to address the mass in her right kidney, dysuria, supra pubic groin discomfort, and voiding dysfunction." (*Id.*) Despite Dr. Ryndin's letter, Dr. Donikyan did not change her determination that Middleton had refused the March 8 random drug test, but she referred Middleton to NYCTA's Independent Medical Examiner, Dr. Rollin K. Say, a urologist at Mount Sinai Hospital. (*Id.*)

[* 3]

Dr. Donikyan retired in April 2023. Upon her retirement, Dr. Marlon Munian assumed Dr. Donikyan's responsibilities as MRO on Middleton's case. (*Id.*)

Middleton was seen by Dr. Say on May 5, 2023. Dr. Say found that "the lack of an adequate [urine] sample is unlikely [to be] due to nephrolithiasis ('kidney stone'), but it may be due to 'voiding dysfunction.'" (*Id.* at 10-11)

On May 25, 2023, Middleton visited Dr. Munian, who reviewed Dr. Say's findings and, based on them, informed Middleton that her work status or the verification of her test result as a refusal could not be changed. (*Id.* at 11) Dr. Munian suggested that Middleton follow up with her own urologist. (*Id.*)

Middleton visited Dr. Ryndin again on June 8, 2023. (*Id.*) Subsequently, Dr. Ryndin provided Middleton a letter, dated June 13, 2023, summarizing Dr. Ryndin's conclusions based on the June 8 examination and a CT scan performed on Middleton on June 5, 2023. (*Id.*) According to Dr. Ryndin's letter, the CT scan demonstrated that Middleton had three nonobstructing calculi (*i.e.*, stones) in her right kidney, with the largest measuring 4 millimeters, but that she was not actively passing a kidney or ureteral stone as previously suspected. (*Id.*) Despite the CT results, the letter goes on, Middleton had been complaining of urinary frequency, urgency, and mild to moderate obstructive urinary symptoms. (*Id.*) The letter further states that Middleton has a history of gross hematuria (*i.e.*, blood in urine), with multiple episodes during the prior several months. (*Id.*) Finally, the letter notes that Middleton would be scheduled for a cystoscopy during her next visit to assess the cause of her symptoms. (*Id.*)

On June 13, 2023, Dr. Munian reviewed Dr. Ryndin's letter and determined that Middleton had medical justification for her failure to produce the required urine sample during the March 8 random drug test. (*Id.* at 12) Dr. Munian executed the paperwork returning Middleton to full work, told her that she would be reinstated pending a repeat drug test, and ordered her to undergo a return-to-work test. (*Id.*)

At 2:20 p.m. on June 13, 2023, Dr. Munian sent an email to John Mallios, NYCTA's Director of Drug and Alcohol Programs and Staff and a Designated Employer Representative ("DER") under the applicable regulations, informing him of Dr. Munian's decision on Middleton's case: "Dear all, Employee [Middleton] was deemed as a refusal by Dr. Donikyan. Today based on new

medical information I reversed her decision and client was placed FW (full work), pending a re-peat drug test." (*Id.*)

Dr. Munian and Mr. Mallios thereafter exchanged a series of emails concerning Middleton's case. At 2:21 p.m., Mr. Mallios replied to Dr. Munian's 2:20 p.m. email, asking if Dr. Munian "was available to discuss." (*Id.*) A little more than 15 minutes later, at 2:47 p.m., Dr. Munian replied and advised that his "tour is done in 15 Minutes" and asked whether he should "hang around" or if "we [can] discuss by phone anytime." (*Id.*) At 2:49 p.m., Mr. Mallios replied that, "[a]t a minimum, I think you need to rescind the FW (full work) determination." (*Id.*) Then, at 2:58 p.m., Mr. Mallios wrote:

> Dr M, following our last 2 discussions, the DOB DER (George Oommen) was notified about the refusal in March, about 2 weeks following the FTC. Trying now to confirm that the employee was referred to the SAP. So, at this point, we need to uphold Dr D's refusal determination. (please update the 3/8 record) and continue the employee in a NW status.

(*Id.*)

Although the exact timeline after this series of email messages is unclear,[2] Dr. Munian, who testified to being inexperienced with the governing CFR and these "types of situations," consulted with Mr. Mallios and with his colleagues, reviewed the applicable regulations, and determined that he had applied the incorrect standard to his decision to reverse Dr. Donikyan's prior determination, to wit, a "probable" standard rather than the correct "high degree of proba-bility" standard. (*Id.* at 12-13) Allegedly applying the correct standard to the information that Dr. Ryndin had provided, Dr. Munian decided to uphold Dr. Donikyan's original refusal determina-tion, finding that Middleton's kidney stones were nonobstructing and of a relatively small size and that she was not passing a kidney stone. (*Id.* at 13) Dr. Munian then, at some point on June 13, pulled Middleton out of her return-to-work drug test and informed her of his decision to uphold Dr. Donikyan's original determination. (*Id.*)

On or about June 29, 2023, Middleton received a Disciplinary Action Notification ("DAN") from NYCTA seeking to terminate Middleton's employment based on charges relating to her

---

[2] Although the arbitrator did not state as much in the factual recitation in his Opinion and Award, in his analysis he mentions that Dr. Munian and Mr. Mallios spoke by telephone twice between 2:47 p.m. and 2:58 p.m. (O&A at 22) These may be the "last 2 discussions" referenced in Mr. Mallios's 2:58 p.m. email.

failure to produce a sufficient urine sample during the March 8, 2023 drug test. (*Id.* at 1-2; DAN 23-3723-0097 (NYSCEF Doc. 20)) Middleton was pre-disciplinarily suspended the same day. (O&A at 2)

### B.    The Arbitrator's Decision

Consistent with the CBA, an arbitration proceeding was commenced to resolve the disciplinary charges against Middleton. An arbitrator was appointed pursuant to the CBA, and a hearing was held via Zoom on October 12 and 25, 2023. (*Id.*) The arbitrator issued his Opinion and Award on November 20, 2023.

The arbitrator summarized his own decision as follows:

> After a careful and thorough review of the record, I find [that NYCTA] did not convince me [that Middleton] is guilty of the charges and that dismissal is the appropriate penalty. The standard of review I used is whether [NYCTA] convinced me that [Middleton] is guilty by the preponderance of the credible evidence, making it more likely than not [that Middleton] engaged in the charged misconduct. [NYCTA] did not convince me for the following reasons: 1) Absent new medical information, the CFR does not explicitly permit [Dr.] Munian to reverse his reversal of [Dr.] Donikyan's determination. 2) [Dr.] Munian's inexperience and the complexity of [Middleton's] medical history caused [Dr.] Munian to be unsure of his determination and let [Mr.] Mallios unduly influence him. 3) There is no suspicion that [Middleton] is a drug user, nor is there any doubt she had a history of medical urinary issues and has current issues. 4) [Middleton] followed all directives to be retested and evaluated. And 5) It would be unjust to discipline [Middleton] based on her inability to produce enough urine on March 8, 2023.

(*Id.* at 20)

Concerning the first basis for his decision, the arbitrator relied on the express language of 49 CFR § 40.193. The arbitrator noted that Dr. Munian had communicated his initial determination as soon as he made it, and that no new medical evidence was presented to him between that first communication and his subsequent reversal only a short time later. (*Id.* at 21) "Without new evidence," the arbitrator concluded, "there is no provision in the CFR letting [Dr.] Munian reverse his first conclusion on June 13, 2023. Between . . . 2:19 p.m. [and] 3:00 p.m. no new evidence was presented." (*Id.* at 22)

With respect to Mr. Mallios's influence on Dr. Munian's reversal of his initial conclusion, the arbitrator observed that, in addition to their email exchange, Mr. Mallios and Dr. Munian

spoke by telephone twice between 2:47 p.m. and 2:58 p.m., and that during those calls, Mr. Mallios encouraged Dr. Munian "to review the applicable CFR standard, as stated in [49 CFR §§] 40.149 and 40.193, for evaluating whether new medical evidence supports a finding [that] a medical condition has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of urine specimen." (*Id.*) The arbitrator further noted that Dr. Munian had "held an MRO certification for a relatively short time and was facing a unique situation for the first time of assessing additional medical evidence that [Middleton] provided on a case that was handled by [Dr.] Donikyan until her retirement and was only assigned to [Dr. Munian] the previous month." (*Id.*) Finally, the arbitrator observed that Middleton's pediatric urinary history and current "medical history that is directly related to her urinary tract and kidneys" are complex—and, furthermore, that there was no doubt that the issues in fact existed. (*Id.* at 22-23) Because of that complexity and Dr. Munian's inexperience, the arbitrator concluded that "[Dr.] Munian . . . [was] unsure of his determination and let [Mr.] Mallios unduly influence him." (*Id.* at 21-22)

As to whether or not Middleton is a drug user, the arbitrator stated that "[t]here is no suspicion that [Middleton] is a drug user" and that "[b]oth parties acknowledge [that NYCTA] has drug tested [Middleton] ten (10) times since 2019" and that "[s]he has never tested positive and has never refused to take a drug test." (*Id.* at 22-23) Thus, "[u]nder the unique situation in this matter," the arbitrator concluded that Middleton "deserved the benefit of the doubt and should have been allowed to retest." (*Id.* at 23)

The arbitrator also acknowledged Middleton's compliance with NYCTA's directives before and after the March 8 test. Middleton, according to the arbitrator, never expressly refused to be tested, tried to provide an adequate urine sample on multiple occasions, visited multiple physicians for evidence of her claimed medical issues, and duly disclosed her medical records to NYCTA. (*Id.* at 23). In short, the arbitrator concluded that Middleton "followed [NYCTA's] directions at every turn." (*Id.*)

Finally, the arbitrator acknowledged that the CBA specifically provides for termination as a penalty for refusal to take a drug test (CBA, app. E-1, § 6.2) but that, "under this unique situation," Middleton's termination "would be a clear injustice." (NYSCEF Doc. 5 at 23) The arbitrator found that there was "an adequate medical explanation for [Middleton's] failure to provide a

sufficient urine sample" and that Middleton "should have been allowed to complete the return-to-work drug test." (*Id.* at 23-24)

In the Award, the arbitrator found that the appropriate remedy is Middleton's reinstatement with back pay and benefits to June 13, 2023, contingent on Middleton first taking and passing a return-to-work drug test. (*Id.* at 25)

## II.   LEGAL STANDARD

CPLR § 7510 provides that a court shall confirm an arbitration award upon application of a party made within one year following the award unless the award is vacated or modified in accordance with CPLR § 7511. Confirmation shall be summarily granted unless vacatur or modification is raised by a party or petitioner's application is untimely. *Bernstein Family Ltd. P'ship v. Sovereign Partners L.P.*, 66 A.D.3d 1 (1st Dep't 2009).

Courts may vacate an arbitrator's award only on the grounds stated in CPLR § 7511(b). *N.Y.C. Tr. Auth. v. Transport Works' Union of Am., Local 100, AFL-CIO*, 6 N.Y.3d 332, 336 (2005). CPLR § 7511(b) provides that an arbitration award may be vacated upon a finding that the rights of a party were prejudiced by (1) corruption, fraud, or misconduct in procuring the award; (2) the partiality of an arbitrator; (3) the arbitrator having exceeded their power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or (4) failure to follow the procedures set forth in Article 75 of the CPLR. CPLR § 7511(b)(1)(i)-(iv). An arbitrator exceeds their power "only where the arbitrator's award violates strong public policy, is irrational[,] or clearly exceeds a specifically enumerated limitation on the arbitrator's power." *N.Y.C. Tr. Auth.*, 6 N.Y.3d at 336.

The public-policy exception to deference to arbitration awards is limited and applies only in "cases in which public policy considerations, embodied in statute or decisional law, prohibit, in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator." *N.Y.C. Tr. Auth. v. Transp. Workers Union of Am., Local 100, AFL-CIO*, 99 N.Y.2d 1, 7 (2002) (internal quotation marks and citation omitted). In applying the public-policy exception, courts "must be able to examine an arbitration agreement or an award on its face, without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its

**656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority**
**Mot. Seq. No. 001**

**Page 8 of 28**

[* 8]

enforcement." *McIver-Morgan, Inc. v. Dal Piaz*, 108 A.D.3d 47, 51 (1st Dep't 2013) (quoting *In re Sprinzen [Nomberg]*, 46 N.Y.2d 623, 631 (1979)).

A party seeking to vacate an arbitration award bears a "heavy burden of establishing by clear and convincing evidence the existence of any ground for vacating [an] arbitration award under CPLR 7511." *Greenky v. Aytes*, 138 A.D.3d 460, 460 (1st Dep't 2016) (internal quotation marks and citation omitted). "Even where an arbitrator has made an error of law or fact, courts generally may not disturb the arbitrator's decision." *In re Falzone*, 15 N.Y.3d 530, 534 (2010) (citation omitted).

## III.   DISCUSSION

Upon review of the parties' arguments in this proceeding, two overarching issues are presented for resolution. The first is whether the arbitrator's decision is precluded under applicable federal law. NYCTA argues that, under the CFR, an MRO like Dr. Munian has sole authority to make medical determinations, including whether a safety-sensitive employee has failed or refused to take a drug test, and that the regulations expressly prohibit an arbitrator from reviewing and overturing an MRO's medical determination. The arbitrator, NYCTA argues, overturned Dr. Munian's determination in violation of the applicable regulations. Therefore, NYCTA argues, because the regulations preempt conflicting state law, a court may not affirm the arbitrator's Opinion and Award pursuant to New York state law providing for deference to and circumscribed review of arbitration awards.

Petitioners contend that applicable New York Court of Appeals precedent provides that a court reviewing an arbitration award pursuant to Article 75 may not alter the arbitrator's findings of fact and legal conclusions, even if the award violates a provision of the federal regulations governing drug testing, and thus the arbitrator's Opinion and Award reinstating Middleton to her bus-operator position must be confirmed.

The second overarching issue is whether the arbitrator had the authority to reinstate Middleton without requiring her to comply with the substance-abuse professional ("SAP") evaluation, referral, and education/treatment process set forth in 49 CFR § 40.281 *et seq.* The parties agree that, regardless of whether the arbitrator impermissibly overturned Dr. Munian's medical determination, the arbitrator had the authority to reinstate Middleton. NYCTA argues, however, that

[* 9]

Middleton would first have to complete the SAP process. To the extent that Petitioners argue to the contrary—and it is not clear that Petitioners actually disagree with NYCTA—they argue that the arbitrator's requirement that Middleton take a return-to-work drug test complies with the regulations.

The Court addresses each of these issues in turn below.

### A.      The Arbitrator Impermissibly Overturned the MRO's Medical Determination

The Department of Transportation (the "<u>DOT</u>") is statutorily mandated to issue regulations that, "[i]n the interest of public transportation safety," "establish a program requiring public transportation operations that receive financial assistance . . . to conduct . . . random . . . testing of public transportation employees responsible for safety-sensitive functions . . . for the use of a controlled substance in violation of law or a United States Government regulation." 49 U.S.C. § 5331(b). The DOT and the Federal Transit Administration, an agency within the DOT, promulgated regulations establishing such a program codified in title 49, parts 40 and 655 of the CFR.[3] These regulations expressly preempt conflicting state laws. 49 U.S.C. § 5331(f) ("A State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this section."); 49 CFR § 655.6 ("[T]his part preempts any state or local law, rule, regulation, or order to the extent that:  (1) Compliance with both the state or local requirement and any requirement in this part is not possible; or (2) Compliance with the state or local requirement is an obstacle to the accomplishment and execution of any requirement in this part.").

Middleton, as a NYCTA employee in a safety-sensitive position, was required under both the regulations and the CBA to participate in random drug testing. (CBA, app. E-1, § 5.3) The regulations require that an employee subject to a random drug test must provide at least 45 milliliters of urine at one time within a three-hour testing period. *See* 49 CFR § 40.193(a), (b). If the first attempt at specimen collection does not result in 45 milliliters of urine, the employee can make additional attempts during the three-hour period. *See id.* The employee should be urged to

---

[3]  The FTA mandates that covered transportation employers must establish drug and alcohol testing programs, the exact details of which are established in the remaining sections of the regulations, are set forth in 49 CFR §§ 655.21 and 655.31.

drink up to 40 ounces of fluid, but her refusal to do so is not itself a refusal to participate in the test. *Id.* § 40.193(b)(1)(ii).

Should the employee fail to provide the required specimen within the three-hour period, she is referred to a physician "who has expertise in the medical issue raised by the employee's failure to provide a sufficient specimen." *See id.* § 40.193(c). The referral physician must be "acceptable to the MRO" and must, within five days, provide a written evaluation of the employee to the MRO containing the referral physician's recommendations and the basis for them. *Id.* § 40.193(c), (f).

The referral physician's report must recommend that the MRO determine either that a "medical condition has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of specimen" or that an adequate basis to make such a determination does not exist. *Id.* § 40.193(d)(1), (2). A "medical condition" for purposes of the regulation "includes an ascertainable physiological condition (e.g., a urinary system dysfunction . . . ), or a medically documented pre-existing psychological disorder, but does not include unsupported assertions of 'situational anxiety' or dehydration." *Id.* § 40.193(e). An MRO "must seriously consider and assess the referral physician's recommendations in making [the MRO's] determination about whether the employee has a medical condition that has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of specimen." *Id.* § 40.193(h). As soon as an MRO makes her determination concerning the existence or nonexistence of such a medical condition, the MRO must report that determination to the DER in writing. *See id.*

If the MRO accepts the referral physician's recommendation that a medical condition precluding the employee from providing a sufficient specimen exists, the MRO must check "Test Cancelled" on the required paperwork. *Id.* § 40.193(d)(1)(i). An employer receiving an MRO's report indicating that the test in question is cancelled may not take any further action with respect to the employee. *Id.* § 40.193(i).

Here, NYCTA argues that the arbitrator's Opinion and Award overturned Dr. Munian's medical determination that Middleton had failed, through Dr. Ryndin's evaluation and letter, to establish a qualifying excuse for her failure to provide a sufficient urine specimen. NYCTA further argues that the regulations invest an MRO, like Dr. Munian, with the "sole authority" to make

**656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority**                          **Page 11 of 28**
**Mot. Seq. No. 001**

such medical determinations and expressly preclude an arbitrator from overturning them. In support of this argument, NYCTA cites a number of regulations and authoritative agency interpretations thereof. Of the regulations cited, however, the Court finds that only one potentially supports of NYCTA's position:  49 CFR § 40.149(c).[4]

Section 40.149(c), entitled "May the MRO change a verified drug test result?," provides:

> You are the only person permitted to change a verified test result, such as a verified positive test result or a determination that an individual has refused to test because of adulteration or substitution. This is because, as the MRO, you have the sole authority under this part to make medical determinations leading to a verified test (e.g., a determination that there was or was not a legitimate medical explanation for a laboratory test result). For example, an arbitrator is not permitted to overturn the medical judgment of the MRO that the employee failed to present a legitimate medical explanation for a positive, adulterated, or substituted test result of his or her specimen.

The DOT itself interprets this provision to preclude an arbitrator from overturning the medical judgment of an MRO, including an MRO's determination concerning an employee's excuse for failing to provide a sufficient specimen:

> The MRO is the only person authorized to change a verified test result (see § 40.149(C)). The MRO can do so with respect to a verification decision he or she has made, in the circumstances described in § 40.149.
>
> An arbitrator is someone who derives his authority from the employer, or from a labor-management agreement. The arbitrator cannot exercise authority that the employer could not exercise on its own. The arbitrator could not overturn a decision of the MRO concerning a test verification any more than the employer could on its own.
>
> This prohibition applies to substantive decisions the MRO makes about the merits of a test (e.g., with respect to . . . *whether a medical condition precluded an individual from providing a sufficient specimen*).
>
> An arbitrator could determine that a test result should be cancelled because of a defect in the drug testing process involving the MRO (e.g., that the MRO failed to afford the employee the opportunity for a verification interview). But an arbitrator could not overturn the substantive judgment of the MRO about whether, for example, the information submitted by the employee constituted a legitimate medical explanation.

---

[4]  NYCTA also cites 49 CFR §§ 40.148(a), 40.149(a), 40.191(a)(3) and (5), and 40.193(a), (c), (d), and (h). Section 40.148 does not appear to exist. And none of the other sections appear to address at all whether an MRO has sole authority.

**656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority**                    **Page 12 of 28**
**Mot. Seq. No. 001**

Dep't of Transp., Office of Gen. Counsel & Office of Drug & Alcohol Policy & Compliance, *September 2001 Part 40 Questions and Answers* § 40.149, https://www.transportation.gov/odapc/september-2001-part40QandAs (emphasis added) [hereinafter DOT Q&As]; *see also* Procedures for Transportation Workplace Drug and Alcohol Testing Programs: Addition of Oral Fluid Specimen Testing for Drugs, 88 Fed. Reg. 27596, 27622 (May 2, 2023) ("[R]efusals are violations that cannot be overturned in a decision about personnel action. An arbitration, grievance, State court or other non-Federal forum cannot overturn the employer's determination of a refusal on a DOT-regulated test. . . . None of these forums has jurisdiction over DOT-regulated Federal drug or alcohol testing, the determination of a refusal under part 40, or the regulatory consequences that exist to ensure transportation safety is served.").

For purposes of this proceeding, the issue has been decided in *City of Ithaca v. Civil Service Employees Association, Inc.*, 25 A.D.3d 859 (3rd Dep't 2006). There, a city truck driver was suspended without pay when an MRO determined that the employee's failure to urinate at the time of a random drug test was not excused by a pre-existing psychological condition. *Id.* at 860. The union, which filed a grievance on the employee's behalf, conceded that, pursuant to 49 CFR § 40.149(c), the MRO's substantive decision could not be overturned by an arbitrator. *Id.* The Third Department held that, "[i]nasmuch as respondent's challenge to the employer's disciplinary action was based solely on the MRO's substantive, nondelegable medical determination, Supreme Court properly granted petitioner's application to stay arbitration." *Id.* at 860-61; *see also Melman v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:08-cv-1205, 2009 WL 2027120, at *3 (M.D. Tenn. July 9, 2009) ("Under DOT regulations, if a person is unable to provide an adequate urine sample for a required drug test, the MRO has the sole authority to make or change a determination that the inability was caused by a medical condition." (citing 49 CFR § 40.149(c))). The Court of Appeals subsequently denied leave to appeal. *City of Ithaca v. Civil Serv. Emps. Ass'n, Inc.*, 6 N.Y.3d 712 (2006). Notwithstanding the Court of Appeals's denial of leave, with no apparent direct First Department precedent on the issue, this Court is bound to follow the Third Department's holding. McKinney's Cons. Laws of NY, Statutes § 72(b); *D'Alessandro v. Carro*, 123 A.D.3d 1, 6 (1st Dep't 2014); *Mountain View Coach Lines, Inc. v. Storms*, 102 A.D.2d 663, 664-65 (2d Dep't 1984).

Petitioners are in a position similar to the petitioner in *City of Ithaca*, inasmuch as Petitioners do not challenge NYCTA's assertion that § 40.149(c) precluded the arbitrator from overturning Dr. Munian's substantive medical determinations. (*Compare* Cr.-Pet. ¶¶ 65, 68, *with* VA ¶¶ 65, 68) Therefore, the Court concludes that, pursuant to 49 CFR § 40.149(c), the arbitrator could not have overturned Dr. Munian's substantive medical determinations.

This, of course, simply returns the analysis to the central question here: Did the arbitrator in fact overturn Dr. Munian's substantive medical determination? NYCTA contends that the arbitrator did just that. Petitioners, however, contend that the arbitrator instead reviewed and found fault with the *process* by which Dr. Munian made his determination and that such review is not preempted and is entitled to the usual deference afforded under New York law to arbitrator factual and legal determinations. Petitioners point to a number of New York Court of Appeals decisions but rely primarily on *Dowleyne v. New York City Transit Authority*, 3 N.Y.3d 633 (2004).[5] NYCTA, in turn, dismisses *Dowleyne*'s relevance and argues that the arbitrator effectively looked behind the substance of Dr. Munian's medical determination in the guise of purporting to review Dr. Munian's process.

*Dowleyne* is relevant to the resolution of the issues presented in this proceeding and warrants extended discussion. In *Dowleyne*, like here, a NYCTA bus operator, Leslie Dowleyne, was unable to produce 45 milliliters of urine during a random drug test, despite attempting to do so multiple times during the three-hour testing period. Index No. 103565/02, slip op. at 4 (N.Y. Sup. Ct. N.Y. Cty. Dec. 3, 2002) (NYSCEF Doc. 9). Ms. Dowleyne reported to the MRO the following day and was referred to Dr. Avram L. Nemetz, "a doctor acceptable to the NYCTA." *Id.* at 4-5. "Dr. Nemetz's report noted certain medical history and current symptoms . . . but concluded that [Ms. Dowleyne] had no medical condition that would limit her ability to urinate." *Id.* at 5. After receiving Dr. Nemetz's report, the MRO noted that there was no medical reason for Ms. Dowleyne's inability to provide a sufficient urine specimen, and NYCTA served Ms. Dowleyne with

---

[5] None of the other cases on which Petitioners rely concern the specific regulations governing the random drug-testing process or an MRO's role therein. Instead, these cases all concern an arbitrator's authority to modify the penalty's imposed on employees or the scope of the public-policy exception to deference to arbitration awards. *See N.Y.C. Tr. Auth. v. Transp. Workers Union of Am., Local 100*, 14 N.Y.3d 119 (2010); *N.Y.C. Tr. Auth. v. Transp. Workers' Union of Am., Local 100, AFL-CIO*, 6 N.Y.3d 332 (2005); *N.Y.C. Tr. Auth.*, 99 N.Y.2d 1.

**656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority**
**Mot. Seq. No. 001**

**Page 14 of 28**

[* 14]

a Disciplinary Action Notification seeking her termination. *Id.* Ms. Dowleyne appealed pursuant to the terms of the CBA. *Id.*

Ms. Dowleyne was then referred by her union to Dr. Mark Stein, "a urologist specializing in impotence and incontinence." *Id.* "Dr. Stein noted a significant medical history, and tests showing that Ms. Dowleyne had slow urine flow, with periodic inability to urinate at all, decreased bladder capacity and instability." *Id.* Upon receiving Dr. Stein's report, the MRO referred Ms. Dowleyne to Dr. David M. Weiner, who noted that "Ms. Dowleyne has urgency and urgency incontinence at times" but concluded that "these symptoms and the remainder of her physical exam show no evidence of why she should be unable to produce an adequate urine specimen given a three hour time period." *Id.*

Arbitration was thereafter commenced to determine whether NYCTA had cause to discipline Ms. Dowleyne. *Id.* at 6. Only the MRO and Dr. Stein testified at the hearing. *Id.* In his testimony, Dr. Stein opined that Dr. Nemetz "had not performed tests necessary to determine reasonably whether Ms. Dowleyne suffered from a medical condition that would have prevented her from providing a sufficient amount of urine for the drug test." *Id.* "The MRO testified that he did not know Dr. Nemetz, and that he had not been involved in the selection of Dr. Nemetz as the referring physician contracted by the NYCTA for drug test refusal cases." *Id.* NYCTA, in turn, did not submit any evidence establishing "Dr. Nemetz's qualifications to evaluate the medical issues in question." *Id.*

The arbitration board ruled in Ms. Dowleyne's favor, finding that she did not refuse to test and ordering her reinstated with back pay. *Id.* at 7. Based on its review of the evidence submitted, that board stated that:

> a majority of this Board finds the Employer does not have cause to discipline Grievant because her failure to provide a sufficient amount of urine for the random test was not a refusal. . . . [W]e are cancelling the [drug] test based on our finding that the testing and verification procedures used by the Employer were fatally flawed in the circumstances of this case. . . . There is simply no evidence in the record to suggest that the MRO exercised any medical or professional judgment in reviewing the reports of Doctors Nemetz, Stein, and Weiner. Instead, . . . the MRO merely rubber-stamped the findings of Doctors Nemetz and Weiner. . . . The [Federal] regulations clearly envisioned an MRO as an independent and impartial gatekeeper and an advocate for the accuracy and integrity of the drug testing process. The regulations are also clear [that] an MRO cannot delegate these responsibilities . . . . The Employer is mistaken in its apparent belief

[* 15]

that the finding of a refusal is beyond reproach by this Board based solely on the fact that the MRO referred Grievant to a doctor "acceptable to the employer."

*Id.* at 6-7 (alterations in original).

The trial court granted Ms. Dowleyne's petition to confirm the award and denied NYCTA's cross-petition to vacate the award. *Id.* at 13-14. Like here, NYCTA had argued that 49 CFR § 40.149(c) and the DOT Q&As precluded the board from reversing the MRO's determination that Ms. Dowleyne refused to submit to the drug test. *Id.* at 9. The trial court appeared to accept that the regulations in fact precluded an arbitrator from overturning an MRO's substantive medical determination. *See id.* at 9-14. Reviewing the board's decision under the public-policy ground for vacating an arbitration award, however, the trial court rejected NYCTA's argument that the board's decision was precluded under the regulations, on the ground that the board "did not overturn a substantive medical determination by the MRO." *Id.* at 10. Rather, the trial court found that the board "found that the MRO vitiated the drug testing process through the abdication of his duty to insure the accuracy and integrity of the process by failing to exercise his medical judgment and failing to draw 'conclusions.'" *Id.* at 12 (citing 49 CFR § 40.25(f)(10)(iv)(B) (2000)[6]).

---

[6] As the First Department acknowledged in *Dowleyne v. New York City Transit Authority*, 309 A.D.2d 583, 584 n.1 (1st Dep't 2003), part 40 has since been revised to incorporate former part 653 and renumbered. The text of § 40.25 in effect when Ms. Dowleyne's drug test took place reads, in relevant part:

(B) The employer shall direct any employee who does not provide a sufficient urine specimen . . . to obtain, as soon as possible after the attempted provision of urine, an evaluation from a licensed physician who is acceptable to the employer concerning the employee's ability to provide an adequate amount of urine.

(1) If the physician determines, in his or her reasonable medical judgment, that a medical condition has, or with a high degree of probability, could have, precluded the employee from providing an adequate amount of urine, the employee's failure to provide an adequate amount of urine shall not be deemed a refusal to take a test. For purposes of this paragraph, a medical condition includes an ascertainable physiological condition (e.g., a urinary system dysfunction) or a documented pre-existing psychological disorder, but does not include unsupported assertions of "situational anxiety" or dehydration. The physician shall provide to the MRO a brief written statement setting forth his or her conclusion and the basis for it, which shall not include detailed information on the medical condition of the employee. Upon receipt of this statement, the MRO shall report his or her conclusions to the employer in writing.

(2) If the physician, in his or her reasonable medical judgment, is unable to make the determination set forth in paragraph (f)(10)(iv)(B)(1) of this section, the employee's failure to provide an adequate amount of urine shall be regarded as a refusal to take a test. The physician shall provide to the MRO a brief written statement setting forth his or her conclusion and the basis for it, which shall not include detailed information on the medical condition of the employee. Upon receipt of

[* 16]

According to the trial court, the board's conclusion that the MRO failed to exercise the required medical judgment was based on the MRO's failure to provide a "statement regarding the medical basis for his conclusion that Ms. Dowleyne had no medical reason for not providing a sufficient specimen." *Id.* at 10-11. This troubled the board for a number of reasons. *First*, the board observed that there was no evidence of Dr. Nemetz's qualifications, and that the MRO testified that he did not know Dr. Nemetz's or Dr. Weiner's background or qualifications to opine on Mr. Dowleyne's medical conditions, was not involved in their selection as referral physicians,[7] and did not engage in any independent inquiry as to their background or qualifications. *Id.* at 11. *Second*, the board noted that the MRO failed to explain why he credited Dr. Weiner's report over Dr. Stein's report, when Dr. Stein is a urologist specializing in conditions related to incontinence, and failed to reconcile their conflicting reports. *Id. Third*, the board "was also troubled by the failure of either report to address the issue of whether Ms. Dowleyne's medical condition was such that it contributed to an inability to supply the required amount of urine on the day she was tested." *Id.*

The trial court ultimately held that such an abdication of the MRO's responsibility to exercise independent medical judgment when evaluating Ms. Dowleyne's case, "like the failure to afford an employee a verification interview (see Part 40, Answer 25), constitutes a defect in the drug testing process, and is grounds for an arbitral reversal of the MRO's determination resulting from the flawed process." *Id.* at 12.

NYCTA appealed the trial court's decision to the First Department. *Dowleyne v. N.Y.C. Tr. Auth.*, 309 A.D.2d 583 (2003). The First Department reversed the trial court on the same recognized public-policy ground for vacating an arbitral award under which the trial court had performed its analysis. *See id.* at 585. Reaching a different conclusion than the trial court, however, the First Department held that "[s]trong public policy considerations, which are embodied in the express

---

this statement, the MRO shall report his or her conclusions to the employer in writing.

49 CFR § 40.25(f)(10)(iv)(B) (2000), *available at* https://www.govinfo.gov/content/pkg/CFR-2000-title49-vol1/pdf/CFR-2000-title49-vol1-sec40-25.pdf. Although these provisions now exist, in revised form, in 49 CFR § 40.193, the "substance of the regulations has not changed." *Dowleyne*, 309 A.D.2d at 584 n.1.

[7] The regulations in effect at the time of Ms. Dowleyne's drug test mandated that a referral physician be acceptable to NYCTA, 49 CFR § 40.25(f)(10)(iv)(B) (2000), whereas the revised regulations provide that the referral physician be acceptable to the MRO, 49 CFR § 40.193(c). The trial court noted this change in a footnote. *Dowleyne*, Index No. 103565/02, slip op. at 11 n.7.

terms of DOT regulations, militate against allowing anyone who did not comply with random drug testing procedures from performing safety sensitive functions." *Id.* The First Department went on to distinguish other cases in which the Court of Appeals had held that an arbitrator, while interpreting and applying the CBA, could alter the penalty imposed by NYCTA for an employee's refusal to drug test, explaining:

> The parties cannot make a contract which conflicts with the explicit terms of a federal statute and its implementing regulations. In this case, the regulations specifically require a given penalty, that is, that the employee who has refused to take a drug test be removed from performing a safety sensitive function, such as driving a bus, and that she not be reinstated to such position without a verified negative drug test result by a substance abuse professional. The regulations are not discretionary, and the collective bargaining agreement cannot be utilized to frustrate their mandate.

> Further, the arbitrator's determination to reinstate Ms. Dowleyne undermines the important policy of keeping drug users from performing safety sensitive functions. It also subverts the NYCTA's anti-drug policy, and it undermines any deterrent effect on other employees. The ultimate goals of the DOT regulations are the safe operation of NYCTA vehicles and the protection of the public. These can only be accomplished if the regulations are strictly enforced.

*Id.* at 586 (internal citation omitted).

Ms. Dowleyne subsequently appealed to the New York Court of Appeals, which reversed the First Department and reinstated the trial court's judgment confirming the arbitration award. *Dowleyne*, 3 N.Y.3d 633. The Court of Appeals held simply that "[t]he Appellate Division's vacatur cannot stand because it improperly substituted its factual finding for that of a majority of the arbitration panel." *Id.* at 634.

The parties have very different views on the meaning and relevance of the *Dowleyne* decisions. NYCTA takes the position that, taken together, the three *Dowleyne* decisions do *not* "stand for the proposition that CPLR Article 75 state law review of an arbitration award involving the federal drug testing of public transportation safety-sensitive employees is not subject [to] federal preemption." (NYSCEF Doc. 15, ¶ 38) Nor, according to NYCTA, do the *Dowleyne* decisions "hold that an arbitrator can review an MRO medical determination or annul SAP return to work requirements—these are matters of federal law." (*Id.*) While NYCTA acknowledges that the *Dowleyne* decisions and the other cases on which Petitioners rely "stand for the well-established proposition that the scope of judicial review of an arbitration award under state law is exceedingly

656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority
Mot. Seq. No. 001

Page 18 of 28

[* 18]

narrow, and that arbitral errors of fact or law are not judicially reviewable," NYCTA maintains that the cases "do not, and cannot, provide a road for an employee to avoid the federal drug and alcohol testing requirements." (*Id.*) Instead, NYCTA argues that the First Department's decision in *Dowleyne* states the controlling law and should govern the outcome in this proceeding. (*Id.* ¶ 40) According to NYCTA, the "First Department reversed the lower court relying on the explicit language in the federal scheme—that an MRO's determination is not subject to arbitral review," and the Court of Appeals, in reversing the First Department, "did not review the federal scheme, did not mention preemption, and did not reverse on the law, referring only to unstated 'factual findings.'" (*Id.*)

By contrast, Petitioners contend that NYCTA's attempt to distinguish *Dowleyne* as inapposite fails because, "if arbitral review was preempted by an absolute bar under a Federal law, either directly or by operation of public policy, then the Court of Appeals could not have" reversed the First Department. (NYSCEF Doc. 26, ¶ 84) Petitioners observe that the "First Department adopted the view urged by [NYCTA] . . . and was reversed by the Court of Appeals." (*Id.*) Again Petitioners argue that nothing in the applicable federal law permits the DOT "to prescribe regulations that limit the scope of judicial review or the scope of arbitration under Federal or State law" and that nothing in the regulations "prohibit an arbitrator from reviewing the *process* by which a result is arrived [*sic*]." (*Id.* ¶¶ 77-78 (emphasis added)) In support of their argument concerning review of an MRO's *process*, Petitioners point to the same DOT Q&As answer on which NYCTA relies. (*Id.* ¶ 78)

Petitioners' arguments concerning *Dowleyne* hit closer to the mark, although certain of NYCTA's arguments also have some limited merit. As NYCTA contends, collectively the *Dowleyne* decisions do *not* stand for the proposition that federal law and regulation, and specifically title 49, parts 40 and 655 of the CFR, do not preempt state law when state law conflicts with federal law or regulation. Nor could they—it is axiomatic, after all, that in our structure of government, federal law is the "supreme Law of the Land." U.S. Const. art. IV, cl. 2; *Sutton 58 Assocs. LLC v. Pilevsky*, 36 N.Y.3d 297, 305 (2020). Thus, a court cannot confirm an arbitration award under Article 15, thereby converting that award into an enforceable judgment, if enacting the award would force NYCTA to violate express federal law or regulation. The Court has already concluded, based on controlling New York law applying 49 CFR § 40.149(c), as well as Petitioners' own failure to

**656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority**
**Mot. Seq. No. 001**

**Page 19 of 28**

contest the proposition, that an arbitrator cannot overturn an MRO's substantive medical determination, including whether an employee has a qualifying medical excuse for failing to provide a sufficient specimen. To hold otherwise would be to endorse a violation of an express prohibition in the governing regulations.

But Petitioners are nevertheless correct that an arbitrator *can* declare a drug test cancelled if the arbitrator finds fault in the testing process leading to an MRO's medical determination. The DOT Q&As expressly state as much. DOT Q&As § 40.149 ("An arbitrator could determine that a test result should be cancelled because of a defect in the drug testing process involving the MRO."). And *Dowleyne* similarly demonstrates that an arbitrator's authority extends, under the regulations, to testing procedural issues. In *Dowleyne*, the trial court confirmed the arbitration board's decision and award expressly because the board made a factual determination that the MRO, in concluding that Ms. Dowleyne had refused to test, had failed to exercise the independent medical judgment that the board concluded was required under the regulations. *Dowleyne*, Index No. 103565/02, slip op. at 10, 12. As the trial court put it, that failure "constitutes a defect in the drug testing process, and is grounds for an arbitral reversal of the MRO's determination resulting from the flawed process." *Id.* at 12. The Court of Appeals reversed the First Department's decision and upheld the trial court's decision because the First Department had "substituted its factual finding for that of a majority of the arbitration panel." *Dowleyne*, 3 N.Y.3d 633. While, as NYCTA points out, the relevant "factual finding" is unstated in the Court of Appeals's decision, there is no mystery as to what that factual finding is. It is, and could only be, the board's finding that the MRO failed to exercise the required medical judgment, resulting in a flawed process under the regulations.

To the extent that NYCTA argues that arbitral review of the circumstances leading to an MRO's substantive medical determination is preempted and barred because such review is tantamount to reviewing the MRO's determination, that argument is meritless and rejected. Of course, cancelling a drug test based on procedural noncompliance will necessarily nullify an MRO's substantive medical determination. But that is not the equivalent of *overturning* the MRO's determination within the meaning of the regulations. If it were, the DOT would not have interpreted § 40.149(c) to permit an arbitrator to cancel a drug test on procedural grounds. Adopting such a meaning would also insulate from review any aspect of the process used in drug testing a

[* 20]

particular employee, no matter how noncompliant it may have been with the governing regulations, so long as an MRO rendered a determination on the employee's case. There is no indication in the plain language of § 40.149(c)—as the DOT itself recognizes—or in the text or structure of the regulations more generally of an intent to shield, in that manner, the drug-testing process from arbitral review.

Clearly, however, the "process" on which an arbitrator relies to cancel a drug test must be set forth expressly in the governing regulations or otherwise fairly implied by the text, structure, or purpose thereof. The DOT provides one example of an express process violation warranting an arbitrator's cancellation of a test: when the MRO fails to afford the employee the opportunity for a verification interview, as expressly required under 49 CFR §§ 40.129 and 40.135-.145. DOT Q&As § 40.149. A second example is failing to afford the employee the full three-hour period in which to provide a sufficient sample, as mandated by 49 CFR § 40.193. *Amalgamated Tr. Union Div. Local 757 (AFL-CIO) v. Tri-Cty. Metro. Transp. Dist. of Or.*, 195 P.3d 389 (Or. Ct. App. 2008) (holding that arbitrator did not violate regulation prohibiting overturning of MRO's medical judgment by finding employee not permitted three hours to provide specimen). *Dowleyne* provides a third example. There, the process violation derived from the regulations' requirements that an MRO exercise her medical judgment and draw "conclusions" while acting as "an independent and impartial gatekeeper and an advocate for the accuracy and integrity of the drug test process." *See Dowleyne*, Index No. 103565/02, slip op. at 6-7, 12; 49 CFR § 40.123(a). An arbitrator cannot cancel a drug test administered pursuant to the federal drug-testing regulations based upon lack of conformance with a testing process that does not exist, in some express or implied form, in the regulations. Such nullification of an MRO's substantive medical determination would constitute a de facto overturning of that determination for reasons not permitted by the regulations.

Significantly, none of the foregoing examples of process violations warranting cancellation of a drug test involve an arbitrator second-guessing the MRO's medical judgment. Such direct second-guessing of an MRO's medical judgment by an arbitrator is the hallmark of an action proscribed under 49 CFR § 40.149(c). Such an action is taken when, upon reviewing the same medical evidence that was reviewed by the MRO, the arbitrator reaches a conclusion differing from the MRO's own conclusion. For example, in *Dowleyne*, had the MRO properly explained the

[* 21]

basis for his conclusions, including why he credited Dr. Weiner's report over Dr. Stein's report, the board could not have then decided that it disagreed with the MRO's conclusions because it assigned *different* weight and significance to the competing reports. If the arbitrator's reversal is rooted in a disagreement with the MRO's exercise of her medical judgment (as opposed to her failure to demonstrate that she exercised such judgment at all, as in *Dowleyne*), then it clearly runs afoul of § 40.194(c).

Close review of the *Dowleyne* decisions also makes clear that NYCTA's assertion that the First Department's statement of the law survives and is controlling is without merit. In its decision, the First Department merely applied the public-policy exception to deference to arbitration awards, finding that the public policy considerations embodied in the express terms of the regulations "militate against allowing anyone who did not comply with random drug testing procedures from performing safety sensitive functions." *Dowleyne*, 309 A.D.2d at 585. Although not explicit in its decision, the Court of Appeals's subsequent reversal demonstrates that the First Department misapprehended the determinative issue in the case. It was not, as the First Department believed, whether Ms. Dowleyne should have been permitted to perform safety-sensitive functions after being found to have refused a random drug test, but, rather, whether Ms. Dowleyne had refused a random drug test in the first place. Of course, wrapped up in that issue was whether the arbitration board had overturned the MRO's substantive medical determination when finding that Ms. Dowleyne had not refused the drug test—an issue that the First Department's decision fails to address. The First Department's stated policy concerns in *Dowleyne* are only relevant *after* the issue of whether a drug test was refused—which may, in turn, implicate whether an MRO's substantive medical determination has been improperly overturned—is first resolved in favor of a refusal.[8]

Finally, while again not explicit in its decision in *Dowleyne*, the Court of Appeals's reversal of the First Department and reinstatement of the trial court's decision nevertheless reveals that courts should apply the normal rules of review when reviewing arbitration awards cancelling a random drug test based on a *process* violation. In other words, where an arbitrator cancels a random drug test due to a process violation, and an MRO's determination is effectively nullified

---

[8] This not to say that NYCTA or another transportation organization subject to the regulations in question cannot temporarily remove an employee from safety-sensitive functions pending final resolution of the issue in arbitration and, if necessary, court proceedings.

thereby, the regulations do not embody a public policy strong enough to override the deference normally afforded to an arbitration award under New York law. This is precisely the review and analysis that the trial court undertook in its decision confirming the arbitration board's decision and award in *Dowleyne*, and that the Court of Appeals endorsed when it reinstated the trial court's decision.

Applying the foregoing to Middleton's case, the Court concludes that the arbitrator's Opinion and Award must be vacated to the extent that it concludes that Middleton is not guilty of the charges that NYCTA has levied against her. Certainly, the facts and circumstances of Middleton's case are unique (and likely will continue to be so). Consequently, because no prior case is on all fours with it, Middleton's case presents a significant analytical challenge. That challenge must, nevertheless, be resolved in favor of vacatur.

Because an arbitrator can review the drug-testing process for compliance with the regulations but not an MRO's medical judgment, that circumstance seems to imply that there is a role for courts to play at this intersection of Article 75 and federal law and regulation in determining, as a threshold matter, whether an arbitrator in fact relied on a process actually embodied in the regulations. If the arbitrator did, then her decision as to whether that process was violated should be afforded all due deference. If the arbitrator did not rely on a process embodied in the regulations, while she may not have directly second-guessed the MRO's medical judgment, she still will have nullified the MRO's substantive medical determination on grounds not permitted under the regulations, and the public-policy exception to courts' deference to arbitration awards should then become applicable.

Here, the arbitrator appears to have invented the process violation on which he relied out of whole cloth. It is undisputed that Dr. Munian first reversed Dr. Donikyan's prior determination of a refusal based on Dr. Ryndin's letter but then, later the same day, reached a different conclusion and upheld Dr. Donikyan's earlier determination. The arbitrator found that this sequence of events was not permitted under the regulations, writing that, "[a]bsent new medical evidence, the CFR has no provision allowing [Dr.] Munian to reverse his initial conclusion on June 13, 2023." (NYSCEF Doc. 5 at 21) The arbitrator further found that Dr. Munian's different conclusions based on the same medical evidence were "caused by [Dr.] Munian's lack of experience applying CFR, the complexity of [Middleton's] pediatric urinary history, and her current medical issues." (*Id.* at

22) As to the arbitrator's first cause, Dr. Munian had testified at the arbitration hearing that "he was inexperienced with the CFRs and lacked a working knowledge of the CFR and experience with these 'types of situations.'" (*Id.* at 13) He had also testified that he applied the wrong standard—a "probable" standard—when first reversing Dr. Donikyan's earlier determination and that he subsequently changed his conclusion only after applying the standard required under the CFR—a "high degree of probability" standard. (*Id.*) Nowhere in the arbitrator's Opinion and Award does he note that he found Dr. Munian not to be a credible witness or otherwise reject his testimony.

The arbitrator's legal conclusion that new medical evidence was required for Dr. Munian's revised determination to be valid is based on the text of 49 CFR § 40.193. (*See id.* at 20-21) Subsection (h) thereof, on which the arbitrator specifically relied, provides:

> As the MRO, you must seriously consider and assess the referral physician's recommendations in making your determination about whether the employee has a medical condition that has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of specimen. You must report your determination to the DER in writing as soon as you make it.

To be sure, as the arbitrator found, nothing in this provision expressly permits an MRO to make successive, conflicting determinations upon the same medical evidence. At the same time, however, nothing in this provision, or in any other provision of § 40.193, expressly *prohibits* an MRO from doing so. But more directly relevant to the situation actually in question here, nothing in the provision, or again in any other provision of § 40.193, expressly prohibits an MRO from immediately revisiting her determination to reconsider and revise it after realizing that she had made an error in rendering it.

Indeed, there is no plausible reason why the drafters of the regulations would have wanted to incorporate by implication therein an *unwritten* process by which an MRO could not correct an error in an express *written* process. If Dr. Munian evaluated Dr. Ryndin's letter under a "probable" standard rather than the expressly mandated "high degree of probability" standard—and, again, there is nothing in the arbitrator's Opinion and Award rejecting that scenario as fact—then that itself constitutes a process violation detrimental to the rider-safety policy goals that animate the regulations. The arbitrator appeared to interpret the second sentence of subsection (h)—"You must report your determination to the DER in writing as soon as you make it"—

[* 24]

to mean that once Dr. Munian sent his email of 2:20 p.m. to Mr. Mallios, Dr. Munian's determination was locked in unless new medical evidence came to light. But it makes little sense that the drafters would want to prevent an MRO from revisiting a determination to apply the required standard of review—an action consonant with the overall purpose of the regulations—in such an oblique manner as suggested by the arbitrator.

In conclusion, the Court finds nothing, either express or implied, in 49 CFR § 40.193 that prevents Dr. Munian from taking the actions that he took in ultimately reaching his determination that Middleton had no medical excuse for her failure to produce a sufficient specimen and upholding Dr. Donikyan's prior determination. As a result, the arbitrator nullified Dr. Munian's substantive medical determination not on any process ground recognized under the regulations but, instead, impermissibly overturned his determination in violation of the regulations. To the extent that it found Middleton not guilty of the charges against her, the arbitrator's Opinion and Award must, therefore, be vacated.

### B. The Arbitrator Impermissibly Reinstated Middleton Without Ordering Her to Undergo Evaluation By a Substance-Abuse Professional

The parties agree that, even if the arbitrator impermissibly overturned Dr. Munian's medical judgment, the appropriate personnel decision—*i.e.*, the penalty, if any, that should be imposed on Middleton—is still within the arbitrator's purview to decide. (*Compare* Cr.-Pet. ¶ 25 ("Whether Middleton is terminated is a contractual matter entirely within the purview of the arbitrator."), *with* VA ¶ 25 ("Petitioner admits the allegations in paragraph 25."), *and id.* ¶ 82) In other words, after considering the evidence presented during the arbitration, the arbitrator could have determined that a penalty less severe than termination, or no penalty at all, should be imposed upon Middleton.

NYCTA argues, however, that whatever any lesser penalty may be, it still must comply with the regulations' requirement that any safety-sensitive employee who fails or refuses a random drug test, such as Middleton did here, must be removed from performing safety-sensitive duties and can only return to performing those duties after completing the prescribed SAP evaluation, referral, and education/treatment process. Because the arbitrator here ordered Middleton reinstated without first undergoing that mandatory SAP process, NYCTA contends that the

**656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority**                     **Page 25 of 28**
**Mot. Seq. No. 001**

arbitrator's Opinion and Award is precluded under the regulations and must be vacated for that reason as well.

NYCTA is correct. The regulations expressly require that before any employee can return to performing safety-sensitive duties after failing or refusing a random drug test, she must first undergo the SAP process and pass a return-to-work drug test. 49 CFR §§ 655.46, 655.61(b); *id.* §§ 40.285(a), 40.305(a). Under the CBA, if an employee has failed or refused a drug test, an arbitrator has the uncontested authority to determine the appropriate remedy, including reinstatement, so long as it does not omit or forego compliance with the SAP process and a return-to-work drug test. *See* Procedures for Transportation Workplace Drug and Alcohol Testing Programs: Addition of Oral Fluid Specimen Testing for Drugs, 88 Fed. Reg. at 27622 ("[A]s has been true from the beginning, all the [DOT] requires is that an employee who violates the rule not perform safety-sensitive functions until and unless he or she successfully completes the return-to-duty process. Decisions about discipline and termination are left to the discretion of the employer or labor-management negotiations. Where employer policy, or labor-management negotiations, have delegated personnel decisions of this kind to an arbitrator, the [DOT] intends that the arbitrator's decision determines the personnel action that the employer takes. . . . [T]he employee must successfully complete the federally required return-to-duty process regardless of what the decision is on the personnel action. This ensures safety is not compromised. Importantly, a refusal is a willful violation of the [DOT's] drug and alcohol safety regulations and is completely separate and apart from employment decisions the employer makes."); *Union Pac. R.R. Co. v. Am. Ry. & Airway Supervisors' Ass'n*, 838 F. App'x 846, 850-51 (5th Cir. 2020) ("[A]n arbitration award would directly contravene § 40.149(c) if it disregarded the MRO's medical determination in ordering an employer to allow an employee to return to performing safety-sensitive work without going through DOT's rehabilitative measures. . . . In other words, an arbitrator may disagree with the MRO as long as its remedy does not conflict with Part 40's return-to-duty procedures. The MRO has the sole authority to establish the validity of a drug test for determining whether those procedures are necessary—not for making personnel decisions. . . . [A] meaningful distinction lies in whether the drug test is valid for purposes of 'personnel policy' or a 'federal safety regulation.' Under the RLA, the arbitrator has the authority to decide the drug test's validity for the former purpose, while under § 40.149(c), the MRO has the authority to decide the drug test's validity for the latter purpose."). If the remedy awarded by the arbitrator does not comply with the federally

656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority
Mot. Seq. No. 001

Page 26 of 28

mandated processes, then the award violates the regulations and, in so doing, implicates precisely the public-policy concerns articulated by the First Department in *Dowleyne*, 309 A.D.2d at 586, and must be vacated.[9]

Here, the arbitrator recognized his authority over personnel decisions and ordered that Middleton be reinstated, because the arbitrator viewed termination as unjust under the evidence. The only condition that the arbitrator placed on Middleton's reinstatement was that she pass a return-to-work drug test. But the regulations require more. As just discussed, in addition to the return-to-work drug test, they require that Middleton undergo the SAP evaluation process set forth in § 40.281 *et seq.* The SAP may, of course, conclude that Middleton has no drug problem requiring referral and treatment, but even the near certainty of that outcome does not obviate the process altogether. To the extent that it awarded Middleton reinstatement without requiring her to first undergo the SAP evaluation process, the arbitrator's Opinion and Award must, therefore, be vacated.

Accordingly, it is hereby:

**ORDERED and ADJUDGED** that Petitioners' Verified Petition and Order to Show Cause (Seq. No. 1) are **DENIED**; and it is further

**ORDERED and ADJUDGED** that NYCTA's Verified Cross-Petition and Notice of Cross-Petition (Seq. No. 1) are **GRANTED**, and the arbitrator's Opinion and Award, dated November 20, 2023, regarding DAN No. 23-3723-0097 is **VACATED**, and this proceeding is **DISMISSED**; and it is further

**ORDERED** that the underlying matter regarding DAN No. 23-3723-0097 is remitted to a different arbitrator to make further determinations in accordance with this Decision and Order; and it is further

---

[9] Soon after the First Department issued its decision in *Dowleyne*, the Court of Appeals issued its decision *New York City Transit Authority*, 99 N.Y.2d 1. The Court of Appeals held in that latter decision that "[t]he legislative authority to 'manage, control and direct' the operation of New York City's public transportation system for the 'convenience and safety of the public' does not translate into a statutory prohibition against some relinquishment to arbitrators of the final say in safety matters when they arise in the context of employee discipline." *Id.* at 9. The specific regulations requiring that an employee who failed or refused a drug test be removed from safety-sensitive duties—on which regulations the First Department primarily relied in *Dowleyne*—were not, however, involved in *New York City Transit Authority*, 99 N.Y.2d 1.

656352/2023 Cashay S. Middleton et al. v. New York City Transit Authority
Mot. Seq. No. 001
Page 27 of 28

[* 27]

**ORDERED** that Respondents shall serve a copy of this Decision and Order upon the Clerk of the General Clerk's Office with notice of entry within twenty (20) days thereof; and it is further

**ORDERED** that service upon the Clerk of Court shall be made in accordance with the procedures set forth in the Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases (Revised August 15, 2019);[10] and it is further

**ORDERED** that any requested relief not expressly addressed herein has been considered and is denied; and it is further

**ORDERED** that the Clerk shall mark Motion Sequence 1 decided in all court records; and it is further

**ORDERED** that the Clerk shall mark this proceeding disposed in all court records.

This constitutes the decision and order of the Court.

| October 1, 2024 | | | | | SHAHABUDDEEN ABID ALLY, A.J.S.C. | |
|---|---|---|---|---|---|---|
| **DATE** | | | | | | |
| CHECK ONE: | X | CASE DISPOSED | | | NON-FINAL DISPOSITION | |
| PETITION: | | GRANTED | X | DENIED | GRANTED IN PART | OTHER |
| CROSS-PETITION: | X | GRANTED | | DENIED | GRANTED IN PART | OTHER |
| CHECK IF APPROPRIATE: | | SETTLE ORDER | | | SUBMIT ORDER | STAY CASE |
| | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

---

[10] The protocols are available at https://www.nycourts.gov/LegacyPDFS/courts/1jd/supctmanh/Efil-protocol.pdf.

[* 28]